THE MISSOURI PACIFIC RAILWAY COMPANY, PLAINTIFF IN ERROR, VS. NELLIE A. LEWIS, ADMINISTRATRIX OF JOSEPH B. LEWIS, DECEASED, DEFENDANT.

1. Administration of Estates: ACTION BY ADMINISTRATRIX: JURISDICTION. L. died in Kansas, from injuries there, for which it is claimed that if death had not ensued the Mo. Pac. R. R. Co., the party inflicting them, would have been liable to an action for damages. The statute of that state provides that an action may be brought against the party by the personal representative of the deceased. The widow, appointed under the laws of Nebraska administratrix of L., brought in the district court of the state a suit against the railway company. Held, That the suit can be maintained, the right of action not being limited by the statute to a personal representative of the deceased appointed in Kansas, and amenable to her jurisdiction. See Dennick v. Railroad Co., 103 U. S. R., 11.

2. ———. The distribution of money, if recovered by the widow from the railroad company, might be enforced by the courts of this state in the manner prescribed by the statute of Kansas. Id.

3. ———: JUDGMENT. The judgment of the county court of W. county, Neb., granting letters of administration to the widow, the sole assets of the estate consisting of the claim against the railroad company, Held, Coram judice, and upheld.

4. Negligence. The construction and operating of a railroad without blocking its frogs and switches is not negligence per se

of which a court will take judicial action upon proof of the fact of such construction and operating, and failure to block the frogs and switches, only.

5. ———: DAMAGES: EVIDENCE. In an action by an administratrix against a railroad company for damages for the death of her husband, where it was alleged in the petition that in constructing its line of railroad the defendant negligently failed to block its switches and frogs, by means of which the deceased, a brakeman employed by defendant, in coupling cars stepped his foot between the rails of the switch, and became fastened there, by reason of which he was run over by the cars and killed, *Held,* That the plaintiff could not recover without the evidence of practical men that unprotected frogs and switches are inherently unsafe and dangerous when prudently and carefully worked and managed, and that blocking them materially lessens the danger of their use and management, and that such was generally recognized by those engaged in the construction and operating of railroads in the country or vicinity by the adoption and use of such improvement, or of evidence equivalent.

ERROR to the district court for Lancaster county. Tried below before FIELD, J.

*A. R. Talbott* and *B. P. Waggener,* for plaintiff in error, on jurisdiction, cited: *McCarthy v. R. R.,* 18 Kan., 46. *Woodward v. R. R.,* 10 Ohio State, 121. *Limekiller v. R. R.,* 33 Kan., 88. Petition does not state cause of action: *A., T. & S. F. R. R. v. Wagner,* 33 Kan., 666. *U. P. R. R. Co. v. Estes,* 37 Id., 715. *McGinnis v. Bridge Co.,* 49 Mich., 466. Evidence: *C., R. I. & P. R. R. v. Lonergan,* 118 Ill., 45. *R. R. Co. v. McCormick,* 74 Ind., 477. *Smith v. R. R.,* 69 Mo., 32.

*W. H. Eller,* for defendant in error, on jurisdiction, cited: Comp. Stat., Ch. 21. Maxwell Pl. and Pr., 96. *Hamilton v. R. R.,* 18 Pac. Rep., 59. *Sells v. Haggard,* 21 Neb., 357. Sufficiency of petition: *Beems v. R. R.,* 12 N. W. Rep., 244. *Mayes v. R. R.,* 14 Id., 340. *Williams v. R. R.,* 43 Iowa, 397. Maxwell Pl. and Pr., 96. Evi-

54

dence: *McGinnis v. Bridge*, 13 N. W. Rep., 819. *Beems v. R. R.*, 12 Id., 222.

COBB, J.

This cause comes to this court by petition in error from the district court of Lancaster county.

The plaintiff in the court below is the widow and administratrix of Joseph B. Lewis, deceased. The petitioner alleges that the defendant is a corporation duly organized and existing by the laws of the states of Nebraska and Kansas, engaged in running and operating a line of railroad from Lincoln, Nebraska, to and through Parsons, Kansas, at which place the defendant has used and operated a number of side tracks for making up trains, both of freight and passenger cars, and employed a number of hands in and about the switching and changing of cars of the defendant, and other cars used and controlled by it, from one track to another, in and about the yards of the defendant; that the defendant used a number of switch engines in handling and changing its cars; that with each of said engines there was employed a crew of hands, consisting of a conductor or yard master, an engineer, a fireman, and from one to three brakemen, under the direct control of the conductor or yard master; that in the construction of the switches and yard of the defendant, and in laying the tracks, the defendant carelessly and negligently, at or near the passenger depot, at Parsons, and within 100 feet of the platform, put in for use what is known as a frog, and negligently failed to protect the same against the danger of its employes stepping into it unnoticed; that on April 1, 1886, the defendant employed the deceased, Joseph B. Lewis, as brakeman, in and about its yards at Parsons, which employment required deceased to perform his duties at night, as well as in day-time; that deceased was a stranger in Parsons, and unacquainted with the dan-

gerous condition of the frogs in the side tracks of the yard; that while so employed on the night of April 8, 1886, at 11 P.M., while discharging duty as brakeman, under direction of the conductor, at the place where the *frog* was unprotected, without knowledge of its unsafe condition, and without carelessness or negligence on his part, the deceased attempted to make a coupling of two cars standing over the *frog* and stepped one foot into the frog, which immediately became fast, and was unable to extricate it. He gave prompt signal to stop the approaching cars, in plain view of the conductor and engineer, in ample time to have prevented injury; that the cars were backed onto and over deceased, crushing his limbs and body, from which he soon after died; that he was a stout and able-bodied man, 24 years of age, capable of earning, and did earn from $50 to $75 per month; that after the death of deceased the plaintiff was duly appointed administratrix of his estate by the county court of Washington county, Nebraska, and, prior to this suit, letters of administration were issued to her. She further alleges that the deceased left no estate, excepting a few hundred dollars in personal property; that she was his wife at the time of his death, and remains his widow; that she has no separate estate of her own; that by his death she has lost her means of support, and is in destitute circumstances; that since his death there has been born to them a daughter, Josephine B. Lewis, who, with plaintiff, is next of kin to deceased; that said minor child is living and dependent on plaintiff for support; that by reason of the death of her said husband by the carelessness, negligence, and wrongful acts of defendant she has sustained damages in $5,000, for which she sues.

The defendant answered both generally and specially, and moved the court for judgment on the issue under the pleadings, which was overruled, with leave to the plaintiff to amend her petition by setting up the Kansas statute as

the cause of action, which amendment was made by the additional paragraph that, "The plaintiff further alleges that some time prior to April 8, 1886, to-wit, on the ...... day of ........., A.D. 18..., the legislature of the state of Kansas, by an act duly passed and approved for that purpose, and which said act was then in full force and operation, gave, clothed, and empowered the said Nellie A. Lewis, widow of the said Joseph B. Lewis, deceased, with authority to bring and maintain an action for damages resulting from his injuries aforesaid in any sum not exceeding ten thousand dollars, which statute, in its general provisions, is similar to the statute of the state of Nebraska in the remedy provided therein, and conforms thereto. A copy of a section of said act is hereto attached, marked A, and made a part hereof, as follows:

"(Sec. 4233) 422.    When the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefor against the latter, if the former might have maintained an action, had he lived, against the latter for an injury by the same act of omission. The action must be commenced in two years, the damages cannot exceed ten thousand dollars, and must inure to the exclusive benefit of the widow and children, if any, or next of kin, to be distributed in the same manner as personal property of the deceased."

The defendant filed its answer to the amended petition, denying all allegations not expressly admitted, and

II.    Denying that it constructed the tracks or switches referred to.

III.    Admitting that Joseph D. Lewis was injured at Parsons, Kansas, April 8, 1886, and about the same date died in Kansas; that prior to that date he was married, and that at his death Nellie A. Lewis was his wife, and as his widow survives him, and that since said date said child has been born as alleged.

IV.    Denying specially that the plaintiff was legally

appointed administratrix of his estate, and alleging that the county court of Washington county, Nebraska, had no authority or jurisdiction to appoint an administratrix of said estate, and that the proceedings were illegal and void, and did not confer authority on the plaintiff to institute or prosecute this action against the defendant, and that this court has no jurisdiction of the subject.

V. Denying specially that the statutes of Nebraska and Kansas are substantially the same; that under the statute of Kansas the widow of deceased inherited one-half of the personal property of the deceased absolutely, and the fund provided by said statute was intended as a trust fund, to be disposed of under the laws of the state of Kansas, and the said statute referred to could not and cannot be enforced beyond the jurisdiction of the courts of the state of Kansas.

VI. Alleging that all injuries received by the said Joseph D. Lewis at the time stated in the petition were the result of carelessness and negligence on his part, and but for such carelessness and negligence at the time and under the circumstances he would not have been injured.

There was a trial to a jury, with a verdict for the plaintiff. Defendant's motion for a new trial being overruled, the cause is brought to this court on the following assignment of errors:

1st. The court erred in admitting over the defendant's objection the testimony of Mrs. Nellie A. Lewis.

2d. The court erred in admitting any testimony whatever to be introduced by the plaintiff below over defendant's objection, because the court had no jurisdiction in the case, and because there was no showing in the petition that the alleged negligence caused the injury to the deceased, and because it was not alleged in said petition that it was usual, or customary, or that it was the duty of the defendant to protect the switches or frogs mentioned in said petition from employes stepping into them unnoticed.

3d.    The court erred in admitting in evidence the papers presented as the original proceedings under which it is claimed the plaintiff below was appointed administratrix, marked "Exhibit B," and in the bill of exceptions over defendant's objection.

4th.    The court erred in hearing said cause upon the pleadings and in taking jurisdiction of the case.

5th.    The court erred in admitting in evidence and allowing the same to be read in said cause, section 422 of the statutes of Kansas, marked "Exhibit C," over the objection of the defendant.

6th.    The court erred in admitting in evidence article I., of section 1 of the statutes of Kansas, relative to letters testamentary and of administration over the objection of the defendant.

7th.    The court erred in admitting in evidence section 1 of chapter 37 of the statute of Kansas, over the objection of the defendant.

8th.    The court erred in admitting in evidence section 29 of chapter 84 of the statutes of Kansas, entitled "Railroads," over the objection of the defendant.

9th.    The court erred in admitting the evidence of H. D. Maynard, over the objection of the defendant, as to what his co-laborer and fellow-servant, Lynch, did with his lantern, and how the witness signaled at night, and as to what the signal up and down with the lantern means.

10th.    The court erred in admitting, over the objection of the defendant, in evidence, section 23 of standard signals of subdivision number 7, under duties of conductors, engineers, and trainsmen, of subdivisions 9, and 23, governing the employes of the Missouri Pacific Railway Company.

11th.    The court erred in overruling the defendant's motion for judgment on the pleadings, to which ruling the defendant then and there excepted.

12th.    The court erred in permitting the plaintiff to

amend her petition by pleading the statutes of Kansas as shown in her amended petition.

13th. The court erred in overruling defendant's demurrer to the amended petition as filed by the plaintiff below, to which ruling the defendant duly excepted.

14th. The court erred in refusing to give paragraphs 1, 16, 12, 11, 5, 17, of the instructions asked for by the defendant.

15th. The court erred in giving paragraphs 1, 3, 4, 5, 6, 8, 9, 13, 14, 16, 17, 20, 21, 22, 23, 24, 25, of the instructions asked for by the plaintiff.

16th. The verdict is not sustained by the evidence.

17th. The court erred in overruling the motion for a new trial.

The first point insisted on by counsel for plaintiff in error is, that the action was improperly brought in the state of Nebraska, it having accrued in the state of Kansas, and not being transitory it should have been prosecuted in the courts of the state of Kansas, and not elsewhere. Many authorities are cited in support of this position. Many of them may be distinguished as wanting analogy to the case at bar, but the time at our disposal will not admit of a general examination for that purpose. It is admitted that the cases of *Woodward v. Ry. Co.*, 10 O. St., 121; *Armstrong v. Beadle*, 5 Sawyer, 484; and probably *Anderson v. Ry. Co.*, 37 Wis., 321, support the principle here ·contended for. The same may be said of *Whitford v. Ry. Co.*, 23 N. Y., 470. But the later cases of *Dennick v. Ry. Co.*, 103 U. S. R., 11; *Leonard v. Steam Nav. Co.*, 84 N. Y., 48; *Morris, Adm:, v. Chicago, R. I. & P. Ry. Co.*, 23 N. W. R., 143 (Iowa case); and *Stoeckman v. Terre Haute & I. Ry. Co.*, 15 Mo. Appeal R., 503, which are in all respects analogous with the case at bar, hold to the contrary. Mr. Justice Thompson delivering the opinion in the case last cited, without reference to that of *Vawter v. The Mo. Pacific Ry. Co.*, 84 Mo., 679, says:

"The question is now we believe presented for the first time in this state. The decisions presented in other states are shown to be conflicting. These statutes are of recent origin. The question of their extra-territorial force has presented itself to various courts of the Union as a question of first impression; and, reasoning on various grounds, for the most part of a technical nature, they have arrived at different conclusions. In this conflict of authority we are quite at liberty to adopt the view which seems best to consist with the policy of our legislation, and with that spirit of comity which ought to subsist between different states of the Union. We accordingly hold that this action was well brought."

It is quite certain that the precise question is before this court for the first time; and I am willing to adopt the language of the court above quoted, as it expresses the conclusion I have come to after a careful examination of all the authorities accessible.

The first ground of error set out in the petition in error is not insisted on by counsel, and will be regarded as abandoned.

The second assignment is argued in the brief, and presents a question of difficulty. The cause of action set out in the petition is, substantially, that plaintiff's decedent was under the general employment of the defendant, as a brakeman, to work in and about its yards. That in the construction of the switches and yards and laying of the tracks the defendant carelessly and negligently put in for use what is known as a switch and frog, and grossly, carelessly, and negligently failed to protect the switch and frog against the danger of its employes stepping into the same unnoticed.

That the deceased was a stranger and unacquainted with the dangerous condition of the switches and frogs of the yard tracks; that while in the employ of defendant, April 8, 1886, at 11 P.M., in the night time, while discharging

duties as a brakeman under the immediate direction of the yard master, at the place where the switch and frog were unprotected, and without knowledge of its unsafe condition, and without carelessness or negligence on his part, the deceased attempted to make a coupling of two cars standing over the frog, and stepped one foot between the rails of the track, near the frog and switch, which immediately became so fastened that he was unable to extricate it. He gave signal to stop the approaching cars, in plain view and hearing of the conductor and engineer, which was given in ample time to have stopped the approaching engine and to have prevented the injury; that the cars were backed onto and over him violently, crushing his limbs and body, from the effects of which he died.

Counsel for plaintiff in error contend that the allegations of the defendant in error fail to state a cause of action in not setting up that it was usual, or customary, or required by some rule of the company, or by statute, or that an obligation rested on the defendant to block or secure the frog or switch of the track against accident and danger.

It is matter of law that it is the obligation of a railroad company to furnish to its employes whose duty it is to handle the means of transportation such tools and machinery, tracks, side tracks, and switches as are reasonably safe and adapted to the purpose to be used, and in good repair. So that, while the petition fails to allege it was customary or usual, or required by some rule of the company, or by statute, to block or secure the frog or switch in the track, I incline to the view that the allegation of the petition "that in the construction of the switches and yard of the said defendant, and in the laying of the tracks thereof, the defendant carelessly and negligently * * * put in for use of said company what is known among railroad operatives as a switch and frog, and grossly, carelessly, and negligently failed to protect said switch and frog against

the danger of their employes stepping into the same un-noticed," under our liberal system of pleading, may, after verdict, be held as equivalent to an allegation that it was the duty of the defendant to block the frogs and switches of its yards and tracks, and that, having failed to do so, the use of the frog and switch was unsafe to those required to use them.

As to the third assignment, though it is not insisted upon by counsel, in their brief, I will say that having held that the plaintiff below might bring her action in this state, for the alleged injuries and death of her husband in another state, it necessarily follows that she may qualify herself to bring such action by taking out letters of ad-ministration in this state.   And, again, I do not think that, in any event, her appointment as administratrix of the deceased could be attacked collaterally.

The next point urged by the plaintiff in error is that arising under the 16th assignment, that " the verdict is not sustained by the evidence."

The first witness on the trial to prove the cause of ac-tion, H. D. Maynard, testified, in substance, that he was engaged generally in the service of defendant; had been employed in several capacities at various times, such as yard master, foreman, fireman, conductor, and switchman; that he resides at Parsons, Kansas, and resided there in April, 1886; that on April 8, 1886, he was foreman of the yard engine; that there were two yard engines then at work belonging to defendant; witness was at that time engaged in night work; that Lewis and Lynch were work-ing with him, and McLaughlin was fireman; witness's engine was on the east side; that Lewis (plaintiff's dece-dent) was with witness and had been with him one night and up to half past 10 or 11 o'clock the following night; that he was not employed by witness's authority, but that of some one else, and was working with witness for the Missouri Pacific Railroad Company; that the same

company was opcrating the yard on the east and west. sides of the passenger depot at Parsons; that Kearney was fireman of the other engine, working on the other side of the yard; that about 11 P.M., April 8, 1886, witness was switching, and just before Lewis was injured the engine was on the west side of the yard attached to two loaded cars; witness was around there to weigh the cars on the scales just south of the depot. [The witness explained from a drawing the relative position of his engine with the two box cars, and his own position, standing immediately west of the depot and in front of the waiting-room door, that Lewis and Lynch were with him, pointing out on the plat where the unattached car stood.] That it stood about half way between the depot and the eating house on the main track, about 35 feet from here down to there, the points specified by the witness to the jury.

In answer to question, is it not about 20 feet? the witness said "he did not know exactly, and would not be positive as to the distance."

Q. As you stood at the point, at the door of the gentlemen's waiting room, what order did you give as to operating the engine?

A. I gave a signal to back up, north.

Q. What did you do?

A. When the engine started to come out of there, the two helpers started down—Lewis and Lynch.

Q. Where did they start for?

A. Towards the detached car that stood on the main track. I stood there until the engine had almost passed, then stepped down behind the engine, to throw the switch, so it could back down on to the scale, which is immediately south of here.

Q. What did you say to them before stepping to throw the switch?

A. I said, "Boys, we will couple on to that car, and back down and weigh the two we have hold of, and bring them around the horn."

Q. Explain what you mean by "bringing around the horn?"

A. It is bringing them up north around the depot to the cut-off, and back down on the east side to place them in the south bound train, which I had partly made up on the track off from the main, in the city yard, back.

Q. After you threw the switch, what did you do?

A. I didn't throw the switch, I started in to do it.

Q. By a juryman. This is a split switch, is it not?

A. Yes.

Q. From where you stepped from the gentlemen's waiting room, could you see Lewis?

A. After I stepped from the engine?

Q. Yes?

A. No.

Q. Now state what was in the way?

A. The engine and cars.

Q. As the engine and cars moved on down what was the next thing you did?

A. After I stepped off behind the engine?

Q. Yes, after you stepped off to throw the switch?

A. I heard somebody *holler*, and stepped back.

Q. To where?

A. Back on to the platform.

Q. On what platform—the depot?

A. On the west side of depot platform.

Q. Had the train passed you when you stepped back?

A. It had gone past me north, yes.

Q. About what was the speed of the train as it passed north?

A. O, it was going about a mile an hour, I guess.

Q. That is what you call very slow, is it not?

A. Yes.

Q. At the time Lewis commenced to work with you, had you any conversation with him as to his experience as a switchman?

A. He told me he never had much experience in the yards; that was when he came to work.

Q. What kind of a hand did he make, as to ability, and to do the work you wanted him to do?

A. He was considered a pretty good man alongside of the other one; he was a better man than the other one.

Q. During the night before that he worked with you, where did you work, generally?

A. We worked generally on the east side.

Q. When he said to you that he had not had much experience, did you show him some of the intricacies of the work?

A. Yes, I did.

Q. Had he done any work on the west side prior to this?

A. Not to my knowledge. I couldn't say whether he had, or not.

Q. During the night before had you a pretty steady night's job?

A. We had not done much the night before, only to let trains into the yard.

Q. You had not done much at making up trains?

A. No, sir.

Q. Referring back to the time you stepped on the platform, you say you heard some one *holler?*

A. Yes, sir.

Q. What was there about that which particularly attracted attention?

A. I thought we had run over one of the soldiers.

Q. Were there soldiers there at the time?

A. A few.

Q. Were there any soldiers in the vicinity of your work?

A. They were all over the engine.

Q. Do you mean to say they were in the cab?

A. Yes, sir, and up on the boiler.

Q.  State why the soldiers were in the cab?

A.  It was on account of the strike, I suppose.

Q.  To keep them from killing the engine?

A.  That was the intention, I believe.

Q.  There was no violence from force, was there, that night, from strikers?

A.  None that I saw.

Q.  When you stepped on the platform, what did you see?

A.  A lot of soldiers standing there.

Q.  Who else besides the soldiers?

A.  I saw the man Lynch.

Q.  What was he doing at the time?

A.  He *hollered* a couple of times, and swung his lantern.

Q.  Lynch belonged to your crew?

A.  Yes, sir.

Q.  What did he do with his lantern?

A.  He was swinging it round, miscellaneously.

Q.  Was he swinging it up and down?

A.  He was swinging it in every direction.

Q.  Now you may state how you signal at night?

A.  With a lantern?

Q.  Yes, what does a signal up and down with a lantern mean?

A.  It meant to go ahead with us there at that time?

Q.  What is the signal when the lantern is swinging round and round?

A.  To back up?

Q.  When the signals are given in the manner you have said Lynch gave them, what does that indicate?

A.  It indicates to stop; they generally do, until they understand what they want.

Q.  Do you always stop on a mixed signal?

A.  Of course that would be for an engineer to say.

Q.  And then is it the custom and rule?

A. If they don't understand the signal they don't move at all.

Q. Where did you next go?

A. I went and picked the young man up.

Q. You may state with what Lynch and Lewis were provided when they entered your service; state what the company furnished them to work with that night?

A. A lamp and a switch key, and it was customary at the time to furnish them with one of those Bishop's couplers, but whether they had one at the time, or not, I could not say.

Q. What had Lewis, as a matter of fact, if you know, when he started back to the unattached car?

A. He had his lantern.

Q. Was it lighted?

A. It was.

Q. Was it a dark night, or otherwise?

A. I don't know, it was about the average.

Q. Do you know if it was the dark of the moon, or the light?

A. I could not say.

Q. What other light was there that you were using in your work?

A. We had some switch light.

Q. Where was it?

A. They were on the opposite side from the depot.

Q. Were they bright or dark?

A. Green and red.

Q. Do they emit light to a person walking along without other aid?

A. No, sir.

Q. They do not intend to emit light?

A. No, sir.

Q. Had your engine a head-light or not?

A. Yes, sir.

Q. Was it lighted?

A.   Yes, sir.

Q.   Did you notice any other lights about the depot?

A.   There was some depot lights hanging upon the side of the wall.

Q.   Do they give light to the track, or not?

A.   They do somewhat, right there.

Q.   Would they give light down on the track, or is it dark there?

A.   I don't know whether they would show any light where he was or not.

The plaintiff offered an almanac of 1886 showing that the moon set at 10:51 on that night.    Examination resumed.

Q.   When you arrived where Lewis was lying, what did you see?

A.   I saw Lewis, with his lantern beside him, not lighted.

Q.   How was he fixed, which direction from the front door of the passenger depot did you find him?

A.   From the west waiting room of the passenger depot I found him south, probably 75 or 100 feet.

Q.   About opposite the end of what building?

A.   It was almost opposite the dining hall and lunch counter.

Q.   How far north did you find him from where the south end of the unattached car stood when he went to couple it?

A.   In the neighborhood of 5 or 6 feet from where the car stood to where he lay.

Q.   It may have been a little more?

A.   I cannot say positively.

Q.   In what position did he lay?

A.   On his face, his left shoulder under or against the wheel, that is the north wheel on the south pair of trucks of the car.

Q.   Was that between the platform and the inside rail?

A. He laid right on the two rails, his head outside of the rail next to the platform.

Q. How about most of his body?

A. Most all of his body was under the car.

Q. Did the car pass over his legs?

A. I could not say, I did not see the car pass over them.

Q. State where his right foot was?

A. The right foot was drawn down between the ball of the rail.

Q. Which rail?

A. The two rails there; it is a split switch, right in the heel of the split switch.

Q. Was his shoe on, or off.

A. Off.

Q. Did you see his shoe?

A. I did, off his foot.

Q. What was the appearance, injured or otherwise?

A. The counter of the shoe was mashed in, the heel was mashed in and broken down.

Q. Where did you find the shoe with reference to his right foot?

A. It lay about 2 feet from his foot, two feet south from his foot, in the direction from which he came.

Q. Do you know the width of the two rails at that point?

A. Seven inches in the clear.

Q. State what you did?

A. I got down there to take him out from under the car, and found his right hand doubled up under his body, his left drawn down between, and dragged into, the parts of the switch, by the wheels, I suppose, as it was crushed some.

Q. Where did the trucks stand at the time you got down there?

A. The north pair of wheels on the south truck was resting right against his left shoulder.

Q.   Which one of these wheels, the farthest north or south?

A.   The north wheel rested against his left shoulder.

Q.   And where was his foot in reference to the other wheel—was it the other way?

A.   Down in behind, to the south.

Q.   Then his feet were to the south, and his head to the north?

A.   One was to the south, the other to the west.

Q.   How was that foot fixed that was to the west?

A.   Lying right there in the middle of the track.

Q.   Was the leg whole, or broken?

A.   I think it was broken, but am not positve.

Q.   How did you find the cars, coupled or uncoupled?

A.   Coupled together, as I intended to have them.

Q.   How did you remove the cars from his body?

A.   I cut the car off just coupled and backed the two that the engine had hold of.

Q.   Did you with the engine, or otherwise?

A.   With the engine; he still lay there, alive and conscious, spoke to me by name, and asked me to take the car off of him; I took him out of there, had to work a few minutes to get him out, put him on a stretcher, and took him to the gentlemen's waiting room a few minutes only, till the company's physician came, when he was moved to his boarding house.

Q.   Was he still conscious when you moved him?

A.   I couldn't say; I stayed as long as I could, close on to the midnight passenger train.   My other man left me alone, and I had to leave him to the doctor and the soldiers.   He talked a little and left a message to his wife. I never saw him again, and he died the next morning.

Q.   As I understand, the car that stood over him was one of the loaded cars?

A.   It was a merchandise car that I was putting into the train.

Q. It was not the car you went north to get?

A. It was the car I was moving on to couple at that time—the car that stood out there at the time.

Q. How did you get the car from his body, with the engine?

A. No, sir; I picked him out the best I could, his arm first, without moving the car, and then had to move the car by hand to get his leg out, and then pushed the car away, and got him off.

*On cross-examination by defendant's attorney:*

Q. How far was Lewis found from the frog of that switch?

A. About 20 feet.

Q. Then he was not in any manner injured by the frog?

A. No, sir.

Q. The switch there was in the same condition as the switches throughout that yard, and, so far as you know, in perfect order and condition?

A. Yes, sir.

Q. By plaintiff's counsel. State whether the switch there was blocked or not?

A. No, sir.

Q. Where his foot was, about how far apart were the rails.

A. Right where he was caught, and was when I found him was about 7 or 8 inches.

Q. By plaintiff's counsel. How deep was it?

A. The depth of a rail, about 6 inches.

Q. The track there was surfaced up with cinders, smooth and level, so that persons walking through the yard on duty would necessarily see what kind of switches there were?

A. Yes, sir.

Q. Was it a part of his duty to throw those switches?

A. Yes, sir.

Q.  Do you know of his having done so during the time he was there?

A.  He throwed the same kind of switches, made and protected the same way, down on the other side.

The witness also testified in reply to:

Q.  How long have you been in railroad business, and have worked where?

A.  Ten or twelve years, at Sedalia, Mo., and Parsons, Kansas.

Q.  Did you ever know of switches of this kind being blocked?

A.  I never saw any of them blocked yet.

Q.  Is it practicable to block them?

A.  It never has been, to my knowledge.

Q.  State whether the working of the switch has an effect on the block.

A.  Yes, sir, the points are right the reverse on a split switch from a stub switch, and putting a block in behind it and throwing the switch around would make a crack in there.    *    *    *    *

Q.  State, from your examination there, how this man was caught, if you can?

A.  It was my opinion that he stepped in to make the coupling, made it all right, and in stepping out the brake beam caught his heel, and threw him down.

Q.  At the near end of each of these cars is a brake beam that hangs down to within how far to the rail?

A.  Five or six inches.

Q.  That beam swings loose there?

A.  Yes, sir.

Q.  How far did this car drag him from where he fell to where you found him?

A.  Not to exceed six feet, I don't know as it was that far.

Q.  His head was in what direction?

A.  To the north.

Q.   Was that the way the train backed?

A.   I had hold of the cars on the front, north end of my engine.

J. A. Kearney, on the part of the plaintiff, corroborated the previous testimony.

The deposition of N. C. Brigham, on the part of the plaintiff, stated that he was a corporal of the Kansas National Guard; that at the time of the accident he was standing twelve to fifteen feet from the deceased, watching him.   Witness showed his position, and that of deceased, on the plat; that the engine and cars backed up to be coupled; that Lewis went in to couple them, the cars backed up against him, pulled him down under the wheels, the trucks and the engine ran over him, and the brakeman standing there gave the signal to the engineer, and he pulled forward again, the trucks of the car coupled on to run over him, then they backed again, and run one pair of trucks of the car coupled on top of him, and the train stopped.   They uncoupled the cars, pulled them away, and then run the car off his body by hand, picked him up, laid him on the platform, got a stretcher, and took him into the depot.

I quote from his further examination:

Q.   State the part of the car that struck him, if you can?

A.   As near as I saw I suppose it was the brake beam.

Q.   What part of his body did it strike?

A.   Struck him on the leg below the knee.

Q.   In what position was he standing?

A.   With his back towards the cars attached to the engine.

Q.   What next after that?

A.   When it caught him, it kind of twisted him down, right on the track, then the trucks passed over him.

Q.   What particular part of his body did the truck strike?

A.    It looked as though it was right across his hips.

Q.    After being struck, how far was he carried along before he fell?

A.    He was not carried any distance at all, just pulled him right down.

    \*       \*       \*       \*       \*       \*

Q.    What light, if any, had Lewis, and what became of it?

A.    I do not remember of seeing any lantern.

The depositions of Leroy Robinson and H. F. De Wolf were also read in evidence on the trial. They were members of the Kansas National Guard, and were present at the occurrence of the accident. Their positions were about the same as that of the deponent Brigham, and their testimony corroborates his in all material evidence, except that Robinson stated deceased had a lighted lantern in his hand when he went in to couple the cars, that his lantern went out, and he hallooed, and went down, immediately, upon the car striking him.

The petition alleges negligence in having the switches and frogs of tracks and side tracks unblocked, by which deceased, whose duty it was to couple cars, in attempting to make a coupling of cars standing immediately over one of the unprotected frogs, stepped one foot between the rails of the track, near the frog and switch, which became fast, so that he was unable to extricate it, etc.

The evidence fails to establish these allegations in two important respects.

It is held in this opinion, substantially, that, under the present system of pleading, an allegation that the defendant, in constructing its railroad, negligently failed to protect its switches and frogs by blocks, might be construed equivalent to an allegation of negligence on the part of the railroad company to construct and operate its road without protecting its frogs and switches in that manner.

This, I think, is justified by the spirit and meaning of

the code, but there is no principle nor practice which would justify us in dispensing with proof of facts from which a court or jury might infer that such failure to block the switches and frogs is negligence.   Evidence of those of practical knowledge, that unprotected frogs and switches are inherently unsafe and dangerous, when prudently and carefully worked and managed, and that blocking them materially lessens the danger of their use and management, and that such safeguard was generally recognized by those engaged in operating railroads, by the use of such improvement, would tend to establish the allegation that the continued and persistent use of unprotected switches by a railroad corporation is negligence on its part.    It is quite possible that such allegation may be proved in some other way, but, if so, our attention has not been called to it.   It is scarcely necessary to say that no evidence of the above character appears in the record.   The only evidence looking to it is that the frogs and switches of the defendant's railroad were unblocked.   In this important particular, then, the evidence fails to sustain the verdict; and if the defendant is not shown to have been guilty of negligence in failing to block its frogs and switches, it is not possible for the plaintiff to maintain her action under the pleadings, for this is the sole allegation of negligence contained in her petition.

As there must be a new trial, is is not deemed advisable to examine the other errors assigned and discussed by counsel, or to further comment on the evidence.

. The judgment of the district court is reversed, and the cause remanded to that court for further proceedings in accordance with law.

REVERSED AND REMANDED.

THE other judges concur.